IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LAMONT BERRY,<br><br>Defendant. | No. CR15-1023<br><br>ORDER REGARDING<br>COMPETENCY |

TABLE OF CONTENTS

I.   INTRODUCTION ................................... 2

II.  PROCEDURAL HISTORY ........................... 2

III. RELEVANT FACTS ................................. 3
     A.  Background .................................. 3
     B.  Mental Health History ........................ 4
     C.  Evaluation at MCC-Chicago ................... 5
     D.  Evaluation by Dr. Gersh ...................... 7

IV.  DISCUSSION ...................................... 8
     A.  Burden of Proof .............................. 9
     B.  Competency ................................. 12

V.   ORDER ......................................... 15

## I. INTRODUCTION

On the 27th day of May 2016, this matter came on for hearing to determine Defendant's competency to stand trial. The Government was represented by Assistant United States Attorney Lisa C. Williams. Defendant Lamont Berry appeared personally and was represented by his attorney, Leslie E. Stokke. Post-hearing briefs were filed on June 16 and 17.

## II. PROCEDURAL HISTORY

On August 26, 2015, Defendant was charged by indictment with one count of possession of firearms by a felon. At his initial appearance and arraignment on August 28, Defendant entered a plea of not guilty. Trial was scheduled for October 26, 2015.

On September 15, 2015, Defendant's attorney filed a motion asking the Court "to order a proper medical evaluation to determine if the Defendant is able to assist counsel, competent and able to proceed in this case, and to ensure that the defendant receives necessary medical treatment." The motion was granted and Defendant was committed to the custody of the attorney general for an appropriate psychiatric or psychological examination. The Court ordered an evaluation of Defendant's competency to stand trial and whether he was legally insane at the time of the offense charged.[1] Defendant was transported to MCC-Chicago for that purpose.

In a report dated February 22, 2016, Ron Nieberding, Ph.D., concluded Defendant was competent to stand trial. After Defendant returned to the Linn County Jail, he was evaluated by Frank S. Gersh, Ph.D., a licensed psychologist retained by Defendant. Dr. Gersh concluded Defendant is not competent to stand trial. The Court then set the matter for hearing.

---

[1] At the instant hearing, Defendant's counsel advised the Court and the Government that Defendant will not assert an insanity or diminished capacity defense.

2

Meanwhile, the trial was rescheduled for August 15, 2016, with a status hearing on July 20, 2016.

### III. RELEVANT FACTS

#### A. Background

Defendant Lamont Berry was born in November 1980 and is currently 35 years old. He was one of approximately 12 children. By all accounts, Defendant had a difficult childhood. According to Defendant, his biological father was sent to prison when Defendant was 3 years old and he never saw him again. Defendant reported he was sexually and physically abused by his step-father. When Defendant was age 11 or 12, his mother was shot and killed by his step-father. Defendant was reportedly in the room when the shooting occurred.[2]

Defendant stayed with an aunt for a short period of time, but was then placed in a foster home. After running away, he was placed in residential treatment facilities. While the record is somewhat imprecise, between ages 12 and 14 he was apparently hospitalized twice in Illinois and once in Florida. Defendant claims he was sexually abused by three older residents and it is claimed he sexually assaulted a 10-year-old female. Following persistent behavioral problems, Defendant was transferred in December 1995 (shortly after his 15th birthday) to the Copper Hills Youth Center, a locked treatment facility in Utah, where he remained until January 2000 (shortly after his 19th birthday).

After being discharged from Copper Hills, Defendant moved to Kankakee, Illinois, where he was placed in a group home. He lived with several others for the next five years. After Defendant began receiving social security benefits, he established a residence with his girlfriend. This relationship produced two children, now ages 11 and 9.

---

[2] When being interviewed by Dr. Gersh, Defendant revealed, apparently for the first time, that at age 9 he watched his brother being shot eight times. There is apparently no other documentation for this alleged incident in the records.

Defendant reported his children were "handed over" to the Department of Child and Family Services and he has had very little contact with them in recent years.

### B. Mental Health History

Defendant received psychiatric treatment throughout his teenage years, first at residential treatment facilities in Illinois and Florida, and then at Copper Hills in Utah. According to reports, Defendant's problematic behaviors included running away, episodes of anger and oppositionality, sleep disturbance, sexual inappropriateness, fearfulness, and possible delusional thoughts. He has been diagnosed at various times with bipolar disorder, attention deficit hyperactivity disorder, impulse disorder, oppositional defiant disorder, developmental expressive language disorder, and mild mental retardation. He was treated with a variety of medications.

Defendant has continued to exhibit psychiatric symptoms as an adult. According to Dr. Nieberding's report (Government's Exhibit 2), Defendant has been hospitalized "on dozens of occasions" in Illinois and Iowa. Generally, the hospital admissions resulted from Defendant's report of suicidal or homicidal ideation. He was often found to be under the influence of illegal controlled substances, including cocaine, marijuana, and amphetamines. On at least a couple of occasions, Defendant admitted to admissions staff that "I just needed someplace to stay . . . I just needed to get out of my situation."

In December 2007, Defendant was admitted to the Riverside Medical Center after coming to the emergency room and stating that he was "depressed and had thoughts of hurting people." Defendant was well known to the staff at Riverside due to multiple prior admissions. Following admission, "[h]e switched very quickly, upon admission, from dysphoric, quiet, and withdrawn to loud, labile, intrusive, and very antagonistic toward staff and peers." Staff concluded from multiple admissions that Defendant "was very manipulative in his treatment." Defendant reported he had been robbed in November 2007 and all of his "public aid money" had been taken. The staff at Riverside concluded

4

Defendant wanted to stay at the hospital until he got his next check. He was discharged after 11 days.

### C. Evaluation at MCC-Chicago

Defendant arrived at MCC-Chicago on October 26, 2015 and remained there until February 5, 2016. During that 104 days, Defendant was administered four psychological tests and interviewed for a total of 8-1/2 hours.[3] In addition, he was observed "in passing" by medical staff. A contract psychiatrist prescribed Zyprexa (an anti-psychotic), Zoloft (an anti-depressant), and Paroxin (for nightmares).[4]

Defendant was administered the Wechsler Abbreviated Scale of Intelligence-II ("WASI-II") test to estimate Defendant's level of cognitive functioning. Dr. Nieberding places Defendant's full-scale IQ at 70, which puts him in the second percentile.

Defendant was also given the Validity Indicator Profile ("VIP") to measure his "response style." "This type of assessment allows for the evaluation of possible exaggeration, or feigning, of mental illness, or cognitive impairment, as well as any attempt on the part of the examinee to engage in positive or negative impression management."[5] On the non-verbal portion of the VIP, Defendant was "compliant" and the results were considered to be valid. On the verbal portion, however, Defendant "demonstrated an irrelevant approach suggesting he may have lost focus and tended to

---

[3] It is unclear why a 104-day stay was necessary when it seems the tests and interviews could have been completed in a fraction of that time.

[4] According to Dr. Nieberding's report (Government's Exhibit 2), he received a phone call from the medical staff at the Linn County Jail, who indicated Defendant was receiving his recently prescribed medication.

[5] Dr. Nieberding's report (Government's Exhibit 2) at 8.

respond in a random or haphazard manner."[6] Dr. Nieberding concluded that the results of the VIP support a conclusion that the IQ results "likely represent an under-estimate of his ability in this area."

Defendant was also administered the Minnesota Multiphasic Personality Inventory-2-Restructured Form ("MMPI-2-RF") to assist in evaluating his personality traits and tendencies. "Results indicated the defendant did not respond to the test items in an overly consistent manner, but tended to positively endorse a majority of the symptoms listed."[7] According to Dr. Nieberding, Defendant "tended to exaggerate the number and severity of a wide variety of medical and cognitive difficulties."[8] Dr. Nieberding considered the MMPI-2-RF results to be invalid.

Finally, Defendant was administered the Evaluation of Competency to Stand Trial-Revised ("ECST-R"). This test is designed to assist in determining a defendant's factual and rational understanding of legal proceedings, his ability to assist counsel, and his response style, or manner of responding to the competency-related test items. According to Dr. Nieberding, Defendant "did not exhibit any overt deficits regarding his factual understanding of the current legal proceedings."[9] Defendant provided a "rather concrete yet fundamentally accurate" description of the trial process and participants. For example, Defendant was able to describe the charge against him and the range of punishments.

Dr. Nieberding diagnosed Defendant with "unspecified trauma and stressor related disorder" and "other specified personality disorder, with mixed (borderline and antisocial)

---

[6] *Id.* at 9.

[7] *Id.*

[8] *Id.*

[9] *Id.*

features." Dr. Nieberding notes in his report that Defendant "appears to be experiencing symptoms consistent with the conditions listed previously," and would likely benefit from continued mental health treatment.[10] Nonetheless, Dr. Nieberding concludes that Defendant appears to maintain an accurate factual and rational understanding of his case and appears capable of assisting in his defense "provided he remains compliant with his current medical regimen."[11]

### D. Evaluation by Dr. Gersh

Dr. Gersh met with Defendant in the interview room at the Linn County Jail for approximately three hours on April 1, 2016. During that time, Dr. Gersh administered five tests: the Wechsler Adult Intelligent Scale-IV ("WAIS-IV"), the Competency Assessment Instrument, the Rey Auditory Verbal Learning Test, the Benton Visual Retention Test, and the Logical Memory I and II Subtests of the Wechsler Memory Scale-III.

Dr. Gersh is critical of Dr. Nieberding administering the abbreviated Wechsler intelligence test (WASI-II). The test used by Dr. Nieberding included four of ten subtests in the WAIS-IV, while Dr. Gersh administered all ten subtests. Dr. Nieberding concluded Defendant has an IQ of 70, which is in the bottom two percent. Dr. Gersh concluded Defendant has an IQ of 63, which is in the bottom one percent. Both scores place Defendant in the "mild mental retardation" range.

The Competency Assessment Instrument is a 13-item structured interview which "assesses understanding of courtroom personnel and procedures, knowledge of the charges

---

[10] *Id.* at 13.

[11] *Id.*

7

and possible sentences, and ability to assist a person's attorney in the defense."[12] According to Dr. Gersh, Defendant understood that the purpose of the exam was to determine whether or not he was capable of standing trial. Defendant told Dr. Gersh that he has "problems understanding" what is said in court and he repeats questions to his attorney because he "forgets what he has been told." According to Defendant, his "brain goes too fast," which prevents him from concentrating. Defendant was aware of the charge pending against him and was aware of the potential sentence. According to Defendant, the jury "listens to everything and they talk about it in the back room," but he mistakenly believed that the judge "finds you guilty."

Dr. Gersh agreed with Dr. Nieberding's diagnosis of "other specified personality disorder, with mixed borderline and antisocial features." In addition, Dr. Gersh diagnosed Defendant with (1) bipolar disorder, with psychosis; (2) post-traumatic stress disorder, chronic; and (3) substance use disorder.[13] Dr. Gersh noted that Defendant's bipolar disorder is "under relatively good control," but opined that if Defendant "does not take his medication, or if he suffers an exacerbation for another reason, and the psychotic thinking returns, this could seriously compromise his competence."[14] Dr. Gersh concluded Defendant is not competent to stand trial. His conclusion is based primarily on Defendant's memory deficits and lack of motivation to assist in his defense.

## IV. DISCUSSION

Defendant's attorney asserts Defendant is not presently competent to stand trial. "A defendant has a due process right not to be convicted while incompetent and to have his competence determined in an evidentiary hearing." *United States v. Mueller*, 661 F.3d

---

[12] Dr. Gersh's Evaluation (Defendant's Exhibit B) at 3.

[13] *Id.* at 5.

[14] *Id.*

338, 352 (8th Cir. 2011) (quoting *United States v. Long Crow*, 37 F.3d 1319, 1325 (8th Cir. 1994)). *See also United States v. Casteel*, 717 F.3d 635, 640-41 (8th Cir. 2013) ("A conviction of an incompetent person is a violation of due process.").

"A defendant is competent to stand trial or face sentencing if he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *United States v. Dahl*, 807 F.3d 900, 904 (8th Cir. 2015). "A defendant is mentally incompetent to stand trial if a preponderance of the evidence indicates that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007). In resolving the competency issue, the Court may consider "numerous factors, 'including expert medical opinions and the court's observations of the defendant's demeanor.'" *Id.* (quoting *United States v. Robinson*, 253 F.3d 1065, 1067 (8th Cir. 2001)).

## A. Burden of Proof

Preliminarily, I will address the burden of proof. Which party bears the burden of proof when competency is disputed has not been firmly established. In *United States v. Whittington*, 586 F.3d 613 (8th Cir. 2009), the Court noted a circuit split on this issue. The Fourth and Tenth Circuits place the burden of proof on the defendant to prove incompetence, while the Third, Fifth, Seventh, and Ninth Circuits place the burden of proof on the Government to prove competence. *Id.* at 617. The Eleventh Circuit has taken the position that the burden falls on the party making the motion to determine competency, and the Second Circuit has declined to reach the issue, noting that "the allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise." *Id.* at 618. While noting that "[t]he guidance of the Supreme Court, and the recent precedent of this circuit,

support the government's position that the burden is on the defendant to prove incompetence by a preponderance of the evidence," the Court in *Whittington* concluded that it "need not address the burden of proof issue further because we conclude the district court's finding of competency in this case did not depend upon the allocation of the burden of proof." *Id.*

In *United States v. Mueller*, 661 F.3d 338 (8th Cir. 2011) — a case decided *after Whittington* — the Court stated unequivocally that "[t]he burden rests with the defendant to demonstrate that he was not competent to stand trial." *Id.* at 352 (quoting *United States v. Denton*, 434 F.3d 1104, 1112 (8th Cir. 2006)). *See also United States v. Jimenez-Villasenor*, 270 F.3d 554, 559 (8th Cir. 2001) ("The burden of persuasion rests with [the defendant] to show that he was incompetent to stand trial by a preponderance of the evidence.").

In his brief, however, Defendant argues he does not have the burden of proof in this regard, citing *Clark v. Bertsch*, 780 F.3d 873, 876 (8th Cir. 2015). There, in a different context, the Court noted that the *en banc* decision in *Mader v. United States*, 654 F.3d 794 (8th Cir. 2011), requires Eighth Circuit panels "to determine and follow the earliest precedent in the event of an intra-circuit panel split." *Id.* at 876 (citing *Mader*, 654 F.3d at 800). Defendant then argues that the earliest relevant panel opinion was *United States v. Maret*, 433 F.2d 1064, 1067 (8th Cir. 1970), which held that the burden of proving legal sanity is on the government. In its brief, the government notes that *Maret* addressed a sanity defense, *not* competency to stand trial, and argues that "its application to a competency issue is tenuous at best." Nonetheless, in discussing burden of proof on the issue of competency, the Court in *Whittington* "compared" *Denton* and *Jimenez-Villasenor* with *Maret*, suggesting some equivalency.

Accordingly, I believe there is still some ambiguity regarding which party has the burden of proof. The Court in *Whittington* discussed the issue and then declined to decide

10

it. The next year, a different panel stated unequivocally in *Mueller* that the defendant has the burden of proof.[15] In the most recent case cited by the parties, *Dahl* (decided in 2015), the Court found the defendant competent without directly addressing the burden of proof. In its opinion, however, the Court stated that "we agree with the district court there was no 'reasonable cause' to believe Dahl was incompetent." 807 F.3d at 904. This sentence seems to infer that there is a presumption of competency and a party asserting incompetence must present "reasonable cause" to reach that conclusion.[16]

The parties have not cited any Eighth Circuit case which places the burden of proof regarding *competency* on the Government, although the burden of proving sanity is clearly on the Government. The majority of circuits place the burden of proof on the government to prove competency, and it may be that the Eighth Circuit will join the majority when finally required to address the issue directly. I believe, however, that I am bound by the last Eighth Circuit decision on this issue, which held unequivocally that "the burden rests with the defendant to demonstrate that he was not competent to stand trial." *Mueller*, 661 F.3d 338, 352. Because *Maret* addressed insanity, and not competency, I do not believe that it stands as the Circuit's law on this issue. Furthermore, apparently every Eighth Circuit panel addressing this issue since that time has placed the burden on the defendant. I find Defendant has the burden of proof.

---

[15] Judge Diana Murphy served on the panel in both *Whittington* and *Mueller*, but did not author either opinion.

[16] The Court notes parenthetically that while the government is generally arguing a defendant is competent, and a defendant is generally arguing that he is not competent, that is not always the case. In *United States v. Ghane*, the Court found defendant not competent to stand trial, and defendant appealed. 593 F.3d 775, 783-84 (8th Cir. 2010).

11

## B. Competency

"There are two elements to a competency finding: (1) whether 'the defendant has a rational as well as factual understanding of the proceedings against him,' and (2) whether the defendant 'is able to consult with his lawyer with a reasonable degree of rational understanding.'" *United States v. Ghane*, 593 F.3d 775, 779 (8th Cir. 2010) (quoting *Denton*, 434 F.3d at 1112). Here, Defendant argues that his limited intellectual ability prevents him from having a factual and rational understanding of the proceedings against him. Defendant further argues that his memory issues prohibit him from assisting properly in his defense.

Turning to the first prong on the competency test, both experts testified that Defendant has a factual understanding of the proceedings against him. That is, Defendant understands the charge and the potential penalty which may be imposed if he is convicted. Defendant also generally understands court procedures, including the roles of various court participants, although he mistakenly believed that the judge "finds you guilty." The experts agreed that any misunderstanding which Defendant may have regarding court proceedings "can be taught" to Defendant.

I believe Defendant also has a "rational" understanding of the proceedings. Dr. Gersh expressed concern that Defendant appeared at times to lack motivation "to stay out of prison." In his report, Dr. Gersh opined that "motivation may improve with treatment," but he remained concerned that Defendant did not have a rational understanding of the consequences of the proceeding. Dr. Gersh's concerns are apparently based on statements made by Defendant during the interview that "boot camp was fun" and he believes prison "might be a vacation." I do not believe that these statements support a conclusion that Defendant does not have a rational understanding of the consequences, rendering him incompetent to stand trial. In *Ghane*, the defendant was found to have a rational understanding of the nature and consequences of the proceeding, despite a

persistent belief that a government conspiracy included his lawyers, the doctors, and the court. Furthermore, Ghane's desire to be found competent and proceed to trial did not support a finding that he lacked a rational understanding of the proceedings. 593 F.3d at 783-84.

The second prong in determining competency is whether Defendant is able to "assist properly in his defense." 18 U.S.C. § 4241(d). Apparently, Defendant and his attorney have an amicable relationship, and Defendant is willing to assist in his defense. It is argued, however, that Defendant's memory deficits prohibit his effective assistance. As stated by Dr. Gersh in his report, "[m]emory and motivation to assist in his defense are not capable of being taught."

In *United States v. DeCoteau*, 630 F.3d 1091 (8th Cir. 2011), the defendant made similar arguments. There, DeCoteau's IQ of 55 to 57 placed him in the mild mental retardation range. *Id.* at 1095. Defendant also asserted that "his short term memory problems made him unable to consult sufficiently with his lawyer or to assist in his own defense." *Id.* The Eighth Circuit concluded the district court did not commit error or abuse its discretion in finding DeCoteau competent to stand trial. *Id.* at 1096.

Turning to the facts in this case, the experts disagree regarding Berry's precise IQ score, but it is undisputed that he falls in the "mild mental retardation" range.[17] Berry testified that he repeatedly asks his attorney questions because "I just forget about it." According to Berry, "that's why I call you so much." Dr. Gersh testified that Defendant "had a great deal of difficulty providing a detailed account of what led up to his arrest." Defendant told Dr. Gersh he could not remember how he came into possession of the firearm, even though there is a photograph of Defendant holding a firearm.

---

[17] Dr. Nieberding scored Defendant at 70, which is in the bottom 2%, while Dr. Gersh scored Defendant at 63, which is in the bottom 1%. I do not find that difference to be significant.

13

The defendant in *Dahl* also exhibited "memory lapses." 807 F.3d at 900. Dahl, who was charged with conspiring to distribute 500 grams or more of methamphetamine, could not recall precise details and quantities and "claimed to have no recollection of an earlier, video-taped interview with police during which he confessed to selling large quantities." *Id.* While it was undisputed that Dahl suffered memory lapses, there was no medical evidence that he was incapable of understanding the nature or consequences of the legal proceedings, and the Eighth Circuit agreed with the district court that there was "no reasonable cause" to believe Dahl was incompetent. *Id.* at 904.

In *Davis v. Wyrick*, 766 F.2d 1197 (8th Cir. 1985), Davis was charged in state court with killing a police officer. Both experts retained by Davis testified that they believed Davis had no recollection of the officer's murder. One of the experts conceded, however, that his amnesia diagnosis was based solely on Davis' statement that he could not remember the homicide. *Id.* at 1200. Two different state court judges found Davis competent to stand trial. The Eighth Circuit concluded that despite Davis' claim of amnesia, there was "ample evidence supporting a finding of Davis' competency to stand trial." *Id.* at 1202. "There is little evidence that Davis' alleged amnesia hindered his ability to understand the proceedings or assist in his defense." *Id. See also United States v. Alley*, 661 F.2d 718, 722 (8th Cir. 1981) ("Partial memory loss does not substantially impair a defendant's ability to consult with counsel and to understand the proceedings against him.").

Here, Defendant is charged with one count of possession of firearms by a felon. Presumably, Defendant's status as a felon is undisputed. Similarly, it is presumably undisputed that the handgun and rifle crossed a state line.[18] Accordingly, the fighting

---

[18] The Court notes that there are no firearms commercially manufactured in the state of Iowa.

issue is whether Defendant possessed the weapons. While Defendant professes not to have any recollection regarding how or where he obtained the firearms, or from whom, the Court does not believe his claims in that regard render him incompetent.

After carefully considering the written reports and hearing testimony of Dr. Nieberding and Dr. Gersh, I find Defendant has not met his burden of proving he is not competent to stand trial. That is, I believe Defendant has both a factual and rational understanding of the proceedings against him. Furthermore, I believe Defendant is able to reasonably assist in his defense.

## V. ORDER

**IT IS THEREFORE ORDERED** that Defendant is hereby found to be **COMPETENT** to stand trial. This case will proceed to trial as scheduled on August 15, 2016. There is a status conference on July 20, 2016.

DATED this 24th day of June, 2016.

*[signature]*

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA